IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| ESCGOV, INC., | ) |
|     Plaintiff, | ) ) ) |
| v. | )   Case No. 1:13-cv-1344 (GBL/TCB) |
| BMC SOFTWARE, INC., | ) ) ) |
|     Defendant. | ) ) |

## **MEMORANDUM OPINION AND ORDER**

THIS MATTER is before the Court on Defendant BMC Software, Inc. ("BMC")'s Motion for Summary Judgment. (Doc. 131.) This case involves the termination of a government contract awarded to Plaintiff ESCgov, Inc. ("ESCgov") following a representation by BMC that ESCgov did not meet the "authorized reseller" requirement of the government's bid solicitation.

There are two issues before the Court. The first issue is whether the Court should grant BMC's Motion as to Count II (Breach of the Non-Displacement Agreement) where BMC alleges that the Non-Displacement Agreement was not supported by consideration separate from the Purchase Order Agreement and that the Non-Displacement Agreement and Purchase Order Agreement were separate agreements requiring separate consideration. The Court GRANTS BMC's Motion because there is no genuine issue of material fact and no reasonable jury could find that ESCgov paid consideration for the obligation imposed on BMC by the Non-Displacement Agreement. The Purchase Order Agreement was executed and made effective well before BMC signed the Non-Displacement Agreement, making the Non-Displacement Agreement a separate contract requiring separate consideration.

The second issue is whether the Court should grant BMC's Motion as to Counts I (Breach of the Perpetual License Agreement), III (Tortious Interference with Contract), IV (Civil Conspiracy), and V (Statutory Conspiracy), where BMC argues that representing ESCgov not to be an "authorized reseller" was factually accurate and, therefore, not tortious misrepresentation. The Court GRANTS BMC's Motion because there is no genuine issue of material fact and no reasonable jury could find the representation false. The record shows that ESCgov was not, in fact, an "authorized reseller" because the only contract affording ESCgov resale rights expired on April 30, 2009, well before BMC made the representation at issue.

Accordingly, the Court GRANTS BMC's Motion for Summary Judgment on all Counts.

## I. BACKGROUND

Plaintiff ESCgov, Inc. ("ESCgov") brings this action against Defendant BMC Software, Inc. ("BMC") on two counts of breach of contract (Counts I and II), one count of tortious interference with contract (Count III), one count of civil conspiracy (Count IV), and one count of statutory conspiracy (Count V). ESCgov is a systems integration firm that provides computer software to a variety of customers, including government agencies. (Doc. 79, ¶ 5.) ESCgov operates on a "Software as a Service" ("SaaS") model where customers rent the use of software licenses from ESCgov on an as-needed basis. (*Id.* ¶ 11.) Under the SaaS model, ownership of the license being rented "as a service" remains with ESCgov, who in turn purchases the license from software developers (*Id.*) BMC is one such software developer and BladeLogic is one of its products. (*Id.* ¶¶ 6, 7.) BMC obtained BladeLogic through its acquisition of BladeLogic, Inc. in April 2008. (*Id.*)

In early 2007, ESCgov and BladeLogic, Inc. met to discuss the possibility of renting BladeLogic to the Defense Information Systems Agency ("DISA"), an agency of the federal

government. (*Id.* ¶ 10.) ESCgov and BladeLogic, Inc. prepared a bid, which DISA accepted in April 2008. (*Id.* ¶ 14.) ESCgov and DISA then executed a contract ("First DISA Contact") for a one-year rental of BladeLogic software, beginning in 2008 with two optional one-year extension periods. (Doc. 132-12.)

ESCgov then negotiated with BMC, by now BladeLogic, Inc.'s successor, to purchase the licenses needed to service the First DISA Contract. (Doc. 79, ¶ 15.) These negotiations resulted in the August 6, 2008 Purchase Order Agreement[1] whereby ESCgov agreed to purchase 20,000 BladeLogic licenses for approximately $2.4 million. (Doc. 132-2.) Later, in December 2008, Kenneth Mellett, BMC's then–Vice President of North American Sales, signed and sent a letter to Keith Zagurski, ESCgov's Executive Vice President, stating that the parties "wish to ensure that . . . [DISA] continue[s] to use BMC software supplied by ESCgov" for the duration of the First DISA Contract. (Doc. 132-9, at 2.) The parties refer to the letter as the "2008 Non-Displacement Agreement."

ESCgov began renting BladeLogic licenses to DISA in conformity with the First DISA Contract. (Doc. 79, ¶¶ 21, 27.) Ultimately, DISA exercised both options to extend, extending the First DISA Contract to July 31, 2012. (*See* Doc. 132-15; Doc. 132-16; Doc. 132-17.) Throughout the duration of the First DISA Contract, DISA used no more than 10,000 of the 20,000 licenses bought from BMC. (Doc. 79, ¶ 28.)

In February 2012, DISA issued a solicitation for a Second DISA Contract to serve as a follow-on to the First DISA Contract. This solicitation, unlike the solicitation for the First DISA Contract, required the winning bidder to be an "authorized reseller" of BladeLogic software. (*See* Doc. 132-19; *see also* Doc. 132-18, Keller Dep. 102:22–105:16.) On March 14, 2012, Ted

---

[1] The parties refer to this agreement interchangeably as the "Perpetual License Agreement," the "Purchase Order Agreement," and simply the "August 6, 2008 Purchase Order."

3

Girard, BMC's Vice President for Federal Sales, met with ESCgov to discuss putting together a bid for the Second DISA Contract. During the meeting, ESCgov informed Girard that it would not be purchasing any new licenses from BMC because ESCgov already had more licenses than DISA needed. In response, Girard asked, "Then what's in it for me?" and "What happens if I go to somebody else?" (Doc. 79, ¶¶ 37–40.)

BMC then sought out another partner to bid on the Second DISA Contract. (*Id.* ¶ 43.) BMC settled on Deloitte Consulting LLP ("Deloitte"). (*Id.* ¶ 44.) In March 2012, Girard met with Deloitte's Federal Practice Principal, Brad Eskind, to discuss how BMC could help Deloitte bid on the Second DISA Contract. (Doc. 79, ¶ 99.) At this meeting, BMC agreed to sell Deloitte 16,500 BladeLogic licenses with associated maintenance for a period of three years. (Doc. 132-10, at 3, Schmieding Dep. 147:7–148:11.) Both Deloitte and ESCgov submitted bids for the Second DISA Contract. (Doc. 132-18, Keller Dep. 119:19–22.)

On July 24, 2012, DISA awarded the Second DISA Contract to ESCgov. (Doc. 132-10, at 7–8, Schmieding Dep. 245:9–246:3.) Days later, Timothy Schmieding, Deloitte's Director for the Department of Defense, met with Eugene Leonardi of BMC and Caryl Foust of DISA to discuss Deloitte protesting the award on the ground that ESCgov was not an authorized reseller of BladeLogic, as the 2012 Solicitation required. (Doc. 155-1, at 10.) On August 1, 2012, Deloitte filed its protest with the Government Accountability Office alleging that ESCgov was not an authorized reseller. (Doc. 132-20.)

Then, on August 2, 2012, BMC gave Deloitte a letter stating that ESCgov was no longer an authorized partner of BMC and therefore had no right to resell BMC products. (Doc. 132-27.) On August 9, 2012, BMC advised DISA that ESCgov was not a current BMC authorized partner and did not possess the right to resell BladeLogic. (Doc. 132-22.) On August 16, 2012, BMC

4

discovered that one of its employees, Sonja Taber, provided ESCgov with a statement confirming that ESCgov was an authorized reseller. (Doc. 155-2.) Thereafter, on August 23, 2012, BMC informed DISA that Taber's representation was in error and that ESCgov was not an authorized BladeLogic reseller. (Doc. 155-1, at 5.) On August 29, 2012, DISA terminated its contract with ESCgov and on August 31, 2012, it awarded the Second DISA Contract to Deloitte. (Doc. 132-18, Keller Dep. 185:3–11.)

## II. PROCEDURAL HISTORY

ESCgov filed its Complaint against BMC on October 29, 2013. (Doc. 1.) On January 10, 2014, the Court granted BMC's Motion to Dismiss Counts IV and V of the Complaint, counts which alleged common law and statutory conspiracy respectively. (Doc. 23.) On April 1, 2014, ESCgov obtained leave to file an Amended Complaint, again alleging common law and statutory conspiracy and also amending ESCgov's request for damages to cover only lost profits, not the cost of purchasing the BladeLogic licenses. (Doc. 79.) On April 4, 2014, BMC filed a Motion for Judgment on the Pleadings and a Motion to Dismiss Counts IV and V of the Amended Complaint. (Doc. 83; Doc. 80.)

On May 9, 2014, the Court denied BMC's Motion for Judgment on the Pleadings, ruling that ESCgov's claims were not barred by the contractual disclaimer of damages because the claims did not "arise out of" or "relate to" issues with BMC software or distribution of BMC software. (Doc. 125.) The Court also denied BMC's Motion to Dismiss, ruling that ESCgov had alleged facts sufficient to plausibly claim that Deloitte knew BMC's representations about ESCgov's authorized-reseller status were inaccurate. (*Id.*)

BMC filed its Motion for Summary Judgment on June 5, 2014. (Doc. 131.) ESCgov filed an Opposition on June 19, 2014, (Doc. 155), and BMC filed a Reply on June 25, 2014. (Doc. 160.) This Motion is now before the Court.

### III. STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56, the Court must grant summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

In reviewing a motion for summary judgment, the Court views the facts in the light most favorable to the nonmoving party. *Boitnott v. Corning, Inc.*, 669 F.3d 172, 175 (4th Cir. 2012) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (citations omitted). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008) (quoting *Anderson*, 477 U.S. at 247–48).

A "material fact" is a fact that might affect the outcome of a party's case. *Anderson*, 477 U.S. at 248; *JKC Holding Co. v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001). The materiality of a fact is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248; *Hooven-Lewis v. Caldera*, 249 F.3d 259, 265 (4th Cir. 2001).

A "genuine" issue concerning a "material" fact arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor. *Resource Bankshares Corp. v. St. Paul Mercury Ins. Co.*, 407 F.3d 631, 635 (4th Cir. 2005) (quoting *Anderson*, 477 U.S. at 248). Rule 56(e) requires the nonmoving party to go beyond the pleadings and by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

## IV. DISCUSSION

The Court GRANTS Defendant BMC's Motion for Summary Judgment for two reasons. First, the Court grants summary judgment to BMC on Count II (Breach of the Non-Displacement Agreement) because there is no genuine issue of material fact and no evidence in the record suggests that ESCgov supplied consideration to support the Non-Displacement Agreement. Therefore, the Non-Displacement Agreement is not enforceable as a matter of law.

Second, the Court grants summary judgment to BMC on all remaining counts, Counts I (Breach of the Perpetual License Agreement), III (Tortious Interference with Contract), IV (Civil Conspiracy), and V (Statutory Conspiracy), because there is no genuine issue of material fact and no reasonable jury could find that BMC's representation about ESCgov's authorized-reseller status was false. Thus, no reasonable jury could find a tortious misrepresentation by BMC.

### A. Non-Displacement Agreement Lacks Adequate Consideration.

The Court GRANTS BMC's Motion for Summary Judgment on Count II because the record shows that the Non-Displacement Agreement ("NDA") was a contract separate from the Purchase Order Agreement, and no evidence suggests that ESCgov paid BMC consideration for the NDA separate from the consideration paid for the Purchase Order Agreement. Additionally,

although ESCgov argues that the NDA imposed a mutual obligation not to displace ESCgov from providing BladeLogic to DISA, the mutuality of that obligation is not apparent from the NDA's language.

"To claim breach of contract, the [p]laintiff must first establish that there was a valid contract to be breached." *Sykes v. Brady-Bushey Ford, Inc.*, 69 Va. Cir. 219, 226 (Va. Cir. Ct. 2005) (citation omitted). "It is blackletter law that consideration is an essential element of a contract." *Qwest Commc'ns v. Global NAPs*, No. 06–873, 2007 WL 7714219 (E.D. Va. Feb. 5, 2007) (internal quotation marks omitted) (citing *Byerly v. Duke Power Co.*, 217 F.2d 803, 806 (4th Cir. 1954)). Where a promisor receives and accepts, in exchange for his promise, "something which he was not previously entitled to receive," it is "adequate consideration to support the promise," even if it is "but a peppercorn." *Richmond Eng'g & Mfg. Corp. v. Loth*, 115 S.E. 774, 787 (Va. 1923) (internal quotation marks omitted). Where the contract is bilateral, "containing mutual promises," and "[t]he promises are of such character that their performance respectively by the one party would have been of advantage in law to the other party," the mutual promises "furnish a sufficient consideration to support the contract." *Branning Mfg. Co. v. Norfolk-S. R.R. Co.*, 121 S.E. 74, 79 (Va. 1924).

Here, ESCgov suggests that there was consideration to support the NDA because the NDA imposed a mutual obligation on ESCgov and BMC not to displace ESCgov from providing BladeLogic to DISA during the First DISA Contract. (*See* Doc. 132-9, at 2.) This mutual-obligation argument fails because, although the NDA explicitly states that BMC agrees not to assist any third party in displacing ESCgov, it fails to impose a reciprocal obligation on ESCgov. (*See id.*) The record shows that the NDA places a unilateral restraint on BMC and BMC alone. In relevant part, the NDA states that "BMC *agrees* not to intentionally assist any third party in

competitively displacing the BMC License sold by [ESCgov] to [DISA] during the Prime Contract." (*Id.* (emphasis added).) There is no parallel "ESCgov agrees" language, however. Rather, the NDA states only that ESCgov "*intends* to utilize exclusively BMC software licenses" and ESCgov "*wish[es]* to ensure that . . . [it shall not] directly do anything to cause [DISA] to stop using BMC's software." (*Id.* (emphasis added).) These statements are expressions of ESCgov's intentions and wishes but not of its binding promise. Because the terms of NDA impose obligations on BMC but no similar obligations on ESCgov, the NDA lacks the necessary consideration from ESCgov and, therefore, the NDA is unenforceable.

ESCgov also argues that BMC was required to "sign the Non-Displacement Agreement as part of ESCgov's purchase of the BladeLogic software." (Doc. 155, at 28.) ESCgov appears to suggest that the NDA and the Purchase Order Agreement were part of the same contract so that the consideration for the Purchase Order Agreement—ESCgov's promise to buy BladeLogic licenses—was also consideration for the NDA. However, the Purchase Order Agreement was executed on August 6, 2008. (*See* Doc. 132-2, at 5.) Thus, on December 15, 2008—the date the NDA was signed—ESCgov was *already* obligated to pay BMC for the BladeLogic licenses. (*See* Doc. 132-3, Zagurski Dep. 233:15–22; *see also* Doc. 132-8.) That preexisting obligation could not have served as consideration for the NDA since "the performance of an existing contract in accordance with its terms" is not consideration making a contract enforceable. *See Seward v. N.Y. Life Ins. Co.*, 152 S.E. 346, 350 (Va. 1930).

In summary, nothing in the record indicates that ESCgov paid BMC consideration for the Non-Displacement Agreement. Because the NDA lacks valid consideration from ESCgov, it is unenforceable and BMC cannot be held liable for breaching it. Therefore, the Court grants BMC's Motion for Summary Judgment on Count II.

### B. BMC's Representation that ESCgov Lacked Resale Rights Was Factually Accurate.

The Court GRANTS BMC's Motion for Summary Judgment on the remaining Counts because there is no genuine issue of material fact and no reasonable jury could find BMC's representation that ESCgov did not possess the right to resell BMC software false at the time ESCgov bid on the Second DISA Contract and, therefore, no reasonable jury could find that BMC committed a tortious misrepresentation. The alleged falsity of BMC's representation serves as the "improper methods" for ESCgov's tortious-interference claim (Count III), the "unlawful act" for ESCgov's conspiracy claims (Counts IV and V), and the violation supporting ESCgov's breach-of-contract claim (Count I). Thus, the viability of these counts depends on the falsity of BMC's representation.

ESCgov suggests that BMC falsely labelled ESCgov an unauthorized reseller of BladeLogic software because even though ESCgov had no rights to resell BMC software, the term "authorized reseller" as used in the 2012 Solicitation did not literally refer to resell rights. Indeed, the record establishes that ESCgov did not have the right to resell BMC software since the parties' Partner Network Agreement ("PNA")—the only contract affording ESCgov resale rights—expired on April 30, 2009, well before the representation at issue was made. (Doc. 132, at 12, 13.) But, ESCgov argues, because DISA used the term "authorized reseller" to mean one able to provide BladeLogic on a SaaS basis, not one able to resell BladeLogic software, BMC made a false representation when it proclaimed ESCgov not to be an authorized reseller..

In short, ESCgov's theory of misrepresentation assumes that the term "authorized reseller" means something besides its plain meaning. However, the Court can find no support in the record for understanding "authorized reseller" as used in the 2012 Solicitation to refer to anything but the right to resell BladeLogic. DISA made a decision to include the term

"authorized reseller" in the 2012 Solicitation and because it did so, the Court applies general principles of contract interpretation to interpret the term's meaning. *See Linc Gov't Servs., LLC v. United States*, 96 Fed. Cl. 672, 708 (2010) (citing *Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1353 (Fed. Cir. 2004)). One such principle is that a term should be afforded its plain and ordinary meaning unless it is manifest that another meaning was intended and understood by all parties. *Id.* (citations omitted). "Equally important, the court must interpret the solicitation as a whole and in a manner which gives reasonable meaning to all its parts and avoids conflict or surplusage of its provisions." *Id.* (citations omitted) (internal quotation marks omitted).

Here, the record does not support the notion that the parties intended to deviate from, or understood themselves to deviate from, the plain meaning of the phrase "authorized reseller." First, DISA's Rule 30(b)(6) representative testified that under the 2012 Solicitation, "[t]o qualify as an authorized reseller . . . the bidder ha[d] to have rights that included the right to resell even if the second DISA contract didn't involve reselling . . . ." (Doc. 132-18, Keller Dep. 207:12–16; *see also id.* at 108:9–15.) Second, the 2012 Solicitation explicitly required bidders *both* to be able to provide BladeLogic as a SaaS and to possess the right to resell BladeLogic. The 2012 Solicitation requested proposals from "contractors who can provide a SaaS solution *and* are authorized resellers of BMC BladeLogic." (Doc. 132-19, at A.1.3; *see also* Doc. 132-18, Keller Dep. 102:22–103:4.) Clearly, DISA did not treat the "authorized reseller" requirement as synonymous with the "ability to provide SaaS" because it referred to *both* requirements in the Solicitation. Third, the Court as a matter of contract interpretation must give meaning to both requirements as set forth in the Solicitation and thus cannot conflate the Solicitation's "authorized reseller" requirement with the Solicitation's other requirement that a winning bidder be able to provide a SaaS solution. *See Donnell v. Metro Life Ins. Co.*, 165 F. App'x 288, 293

(4th Cir. 2006) ("[W]e are guided by the familiar axiom that contract terms should not be construed so as to render superfluous other provisions of the agreement.").

The record also shows that DISA deliberately wrote separate authorized-reseller and SaaS-capacity requirements into the 2012 Solicitation. (*See* Doc. 132-18, Keller Dep. 102:22–105:16; 105:18–106:16; 108:9–15; *see also* Doc. 132-12; Doc. 132-19.) DISA added the "authorized reseller" requirement to the 2012 Solicitation because, as DISA's Rule 30(b)(6) representative testified, DISA encountered issues in the past working with contractors who were not authorized resellers of specific products. (*See* Doc. 132-18, Keller Dep. 105:18–106:16.) To avoid similar difficulties, DISA's 2012 Solicitation required the winning bidder to not only provide BladeLogic on a SaaS basis but to have the right to resell BladeLogic. (*See* Doc. 132-19, at A.1.3.) While ESCgov met the former requirement, it did not possess the rights to resell BladeLogic and, therefore, was not an authorized reseller.

In essence, well-settled principles of contract interpretation dictate that the plain meaning of "authorized reseller" controls and, under that plain meaning, BMC did not make a false representation when stating that ESCgov did not possess the right to resell BMC products. (Doc. 132-22.) That ESCgov lost its resale rights when it failed to renew the PNA is undisputed. Because BMC's statement did nothing more than corroborate an undisputed fact, no reasonable jury could find that BMC committed a tortious misrepresentation. Thus, no genuine dispute of material fact exists and BMC is entitled to judgment as a matter of law on all remaining Counts.

## V. CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** that BMC's Motion for Summary Judgment (Doc. 131) is **GRANTED** and all Counts (I, II, III, IV, and V) in the Amended Complaint (Doc. 79) are **DISMISSED**. The only claims remaining are Counts I

(Breach of Contract) and II (Unjust Enrichment) of BMC's Second Amended Counterclaim (Doc. 73).

**IT IS SO ORDERED.**

ENTERED this 7th day of August, 2014.

Alexandria, Virginia

8/7/2014

/s/
Gerald Bruce Lee
United States District Judge